# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| ROBERT JACKSON, | ) |
| | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) Case No. 15-CV-53-TCK-FHM |
| | ) |
| BOARD OF COUNTY COMMISSIONERS | ) |
| OF MAYES COUNTY, | ) |
| SHERIFF MIKE REED, in his individual | ) |
| and official capacities, | ) |
| | ) |
| **Defendants.** | ) |

## OPINION AND ORDER

Before the Court are the Motion for Summary Judgment of the Board of County Commissioners of Mayes County ("BOCC") (Doc. 48) and the Motion for Summary Judgment of Defendant Sheriff Mike Reed (Doc. 49).

**I.     Factual Background**

   **A.     Events Leading to Termination from Mayes County**

Plaintiff is an African-American male who first worked for the Mayes County Sheriff's Office from April of 2010 to June of 2012 under the employment of Sheriff Frank Cantey ("Cantey"). Cantey terminated Plaintiff because Plaintiff supported Mike Reed ("Reed") in his campaign against Cantey for Sheriff. Reed prevailed over Cantey, and Reed hired Plaintiff for the position of Jail Administrator. Plaintiff began his employment as Jail Administrator on January 2, 2013.

According to Plaintiff, the jailers he supervised were immediately insubordinate to Plaintiff because of his race. Some of the jail staff, including a supervisor named Kenneth Franklin

("Franklin"), became upset when they learned Plaintiff would be their supervisor. Plaintiff claims that Franklin and others repeatedly gave him the "silent treatment."

In early February of 2013, members of the jail staff complained about Plaintiff to Reed. At the end of February of 2013, Reed met with each jail employee to discuss Jackson's performance. According to Reed, jailers complained Plaintiff did not "back them up" when they disciplined inmates and that Plaintiff promised them promotions but failed to follow through. Plaintiff contends that these complaints were baseless, not made in the proper chain of command, and reflected their racial bias. Following these meetings, Reed counseled Plaintiff to improve his leadership. Reed encouraged Plaintiff to attend and paid for several training programs, including leadership training.

In early March of 2013, Reed observed Plaintiff call out to his staff from across the street and correct their behavior. Reed believed this was unprofessional, and Reed scolded Plaintiff for this in front of others. Plaintiff describes this as another example of Reed undermining Plaintiff's authority. On March 12, 2013, Plaintiff received the following "Notice of Counseling":

> This letter is to show that counseling has been given to Robert Jackson for the following reasons. Accusations were brought about by jail employees that Jackson had lied to them on different occasions. After speaking with Jackson, it was determined that the statements made by Jackson were perceived differently than Jackson intended them to be taken. There were also issues of discipline and lack of communication. Counseling was given on appropriate disciplinary actions along with communication and trust building techniques. Sheriff Mike Reed, Undersheriff Gary Shrum, Lieutenant Jonathan Bailey and Jail Administrator Robert Jackson were present at this meeting held on the date stated above. By signing below, all parties agree to the statements made in this counseling form.

(BOCC's Mot. for Summ. J., Ex. 9.) According to Plaintiff, these events in February and March of 2013 show that Reed encouraged or acquiesced to employees' racially motivated insubordination.

On or around May of 2013, Plaintiff contends Reed criticized Plaintiff for hiring a lesbian. Plaintiff defended the hire, stating that, "Look, I'm black and, you know, we're treating them the

same way." (Jackson Dep. 138:17-25.) Reed allegedly stated: "Well, Jackson, you can't help it, you were born black." (*Id.*) Plaintiff viewed this as reflecting Reed's view that being black or lesbian were both less than ideal, but one you could prevent and one you could not.

In late May of 2013, Plaintiff told Franklin to inform Justin Conley ("Conley"), a jailer, that Conley would be switched to the day shift. When Conley received this news from Franklin, Conley called Plaintiff a "black nigger ass lying son of a bitch" and stormed out of the jail yelling "fuck that nigger." This was not in the presence of Plaintiff. Franklin failed to discipline Conley or write an incident report until instructed to do so by Plaintiff, after Franklin and another employee told Plaintiff what happened. After returning to work, Conley made other comments about dressing up as the KKK for Halloween and carrying a noose.

Plaintiff told Reed about Conley's behavior, and Reed told Plaintiff to investigate the incident further. Plaintiff investigated and discovered Conley had made other racially derogatory remarks such as "camel jockey." Conley was terminated on May 22, 2013. Reed contends that he made the decision to fire Conley and that Plaintiff resisted this termination decision. Plaintiff disputes this and contends Conley was terminated based on the "camel jockey" remark rather than the "nigger" remarks. It is undisputed, however, that Reed fired Conley within two days of Conley's racist rant.

On June 7, 2013, Plaintiff received a second "Notice of Counseling:"

This letter is to show that counseling was given to Robert Jackson for the following reasons:
It was determined that Robert Jackson authorized Reserve Deputy time to William Carey without going through proper chain of command (I.e. Jackson should have gone through the Reserve Coordinator to request that time to be used for another Reserve Deputy). It was determined that Robert Jackson did not follow recommendation from Undersheriff Shrum on taking an inmate to Lexington Prison and taking a transport van to Conner Correctional Facility for prisoner transport cage

> refill (Ie. Following the recommendation from Shrum would have saved time and lessened fuel expense). It was determined that Robert Jackson, as an administrator, put himself before his subordinate (I.e. Undersheriff's patrol unit was offered to Deputy Carey for special assignment and Jackson attempted to override that action by giving Carey his older unit and Jackson would take the newer one). Sheriff Mike Reed and Undersheriff Gary Shrum, and Jail Administrator Robert Jackson were present at this meeting held on the date stated above.

(BOCC's Mot. for Summ. J., Ex. 13.)

In July of 2013, Plaintiff recommended Franklin's termination for a number of reasons unrelated to racist remarks or behavior. (Ex. 16 to Pl.'s Resp. to Def. Reed's Mot. For Summ. J.) Reed's undersheriff would not issue any discipline. At another point, Plaintiff felt he was called in to speak with an angry black mother of an inmate solely because he was black.

On September 5, 2013, Reed received five EEOC complaints made by female employees. Two complaints were against Jackson and Reed, and three complaints were only against Reed. On September 16, 2013, Reed scheduled a meeting with Plaintiff to discuss a jailer's complaint about being discriminated against by Plaintiff for health reasons, the EEOC charges, and Plaintiff's alleged refusal to interview an individual named Cody Henson ("Henson"). During this meeting, Reed concluded Plaintiff was lying to him about interviewing Henson. Plaintiff disputes the reasons for the September 16, 2013 meeting and disputes that he lied to Reed. Although he now admits he never interviewed Henson, he believed he had conducted an informal phone interview when he spoke with Reed. This alleged lie, according to Reed, was the "straw that broke the camel's back," and Reed terminated Plaintiff during this meeting. According to Reed, he terminated Plaintiff based on the performance issues set forth in the counseling letters and his overall lack of trust and confidence in Plaintiff's ability to run the jail. According to Plaintiff, Reed also stated as a reason for termination that Plaintiff's employees "didn't like him."

After his termination, Plaintiff called his wife because he was in a state of shock. Plaintiff's wife and sister-in-law came to the jail, packed what they believed were all of his personal belongings, and took the items to a storage unit.

### B. Events Leading to Termination from Delaware County[1]

On November 1, 2013, Plaintiff secured employment with the Delaware County Sheriff's Office under Sheriff Harlan Moore ("Moore"). At some point either before or after Plaintiff commenced this new employment, it was discovered that a taser gun, a pepper gun, a cell phone detector, an office chair, and some other miscellaneous items were missing from Mayes County.

On November 4 or 5, 2013, Reed contacted Moore, and Reed informed Moore that "he [Reed] was doing an investigation on one of [Moore's] employees." (Moore Dep. 32:23-24.) Moore asked to meet with Reed to get more information about the investigation. The two sheriffs met in Spavinaw Park, which is halfway between the two counties. Reed informed Moore that "he [Reed] was seeking to get an arrest warrant and that he was going to call [Oklahoma State Bureau of Investigation ("OSBI")] to conduct an investigation." (*Id.* 34:17-19.)

On November 6, 2013, Moore informed Plaintiff that Plaintiff was being investigated for embezzling property from Mayes County. Moore suspended Plaintiff without pay. This was the first time Plaintiff learned he was being accused of embezzlement. Plaintiff immediately began looking for any items in his possession that possibly belonged to Mayes County. That same day, he located at least some of the items in his storage unit and contacted Mitchell Goodman

---

[1] Defendants have not established, as a matter of undisputed fact, any clear timeline of events leading to Plaintiff's termination from Delaware County. (*See* BOCC's Mot. for Summ. J., Facts 66-75.) The Court's timeline set forth below is based on facts construed favorably to Plaintiff.

5

("Goodman"), a jail employee, about returning the items. Two days later, by November 8, 2013, Plaintiff had located and returned all missing items. Plaintiff submitted "property receipts" dated November 8, 2013, showing what items he returned to Mayes County and to whom. (*See* Pl.'s Resp. to Reed's Mot. for Summ. J., Ex. 9.) Plaintiff claims he had not used the items and that he did not purposefully take them. On November 15, 2013, almost one week after Plaintiff had returned all missing items, Moore terminated Plaintiff. Sometime after Moore's termination from Delaware County, OSBI investigated Plaintiff for embezzlement, including interviewing him at his home and interviewing other Mayes County employees. No charges were filed at that time.

On September 16, 2014, Plaintiff filed this lawsuit in Mayes County, Oklahoma, asserting a tort claim based on Reed's intentional interference with Plaintiff's Delaware County employment. On October 15, 2014, Plaintiff filed an Amended Petition asserting additional claims that Reed violated Title VII and the Due Process Clause of the Fourteenth Amendment in conjunction with Plaintiff's employment and termination ("Amended Complaint").

Sometime after Plaintiff filed this lawsuit in September of 2014 and before February of 2015, Reed spoke with Assistant District Attorney Kari Strain ("Strain") about Plaintiff's embezzlement investigation. On February 20, 2015, a criminal Information was filed charging Plaintiff with embezzlement based upon the two-month period from September to November of 2013 when the Mayes County property was possessed by Plaintiff in his storage unit. Reed admitted that Mayes County suffered no damage, financial or otherwise, based on the lack of access to the property during this time.

On September 3, 2015, while this case was pending and nearly two years after the alleged embezzlement occurred, Judge Rebecca Gore conducted a preliminary hearing on Plaintiff's

embezzlement charges. Strain, on behalf of the State, presented four witnesses, including Goodman and Reed. Judge Gore dismissed the charges, finding insufficient evidence of embezzlement.

## II.     Summary Judgment Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006). The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Id*. However, the party seeking to overcome a motion for summary judgment may not "rest on mere allegations" in its complaint but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The party seeking to overcome a motion for summary judgment must also make a showing sufficient to establish the existence of those elements essential to that party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-33 (1986).

## III.    Reed's Motion for Summary Judgment

Reed moves for summary judgment on all claims asserted against him in both his official and individual capacities.

### A.     Title VII Race Discrimination

#### 1.      Wrongful Termination

"When a plaintiff relies on circumstantial evidence to prove employment discrimination, we apply the three-step burden-shifting framework set forth in *McDonnell Douglas* and its progeny." *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005). "*McDonnell Douglas* first requires the aggrieved employee to establish a prima facie case of prohibited employment action." *Id.* This

burden is one of production (not persuasion), it can involve no credibility assessment, and it is not onerous. *Id.* "If the employee makes a prima facie showing, the burden shifts to the defendant employer to state a legitimate, nondiscriminatory reason for its adverse employment action." *Id.* "If the employer meets this burden, then summary judgment is warranted unless the employee can show there is a genuine issue of material fact as to whether the proffered reasons are pretextual." *Id.*

In order to make a prima facie case for wrongful termination, Plaintiff must show (1) he was a member of a protected class; (2) he was qualified and satisfactorily performing his job; and (3) he was terminated under circumstances giving rise to an inference of race discrimination. *Barlow v. C.R. England, Inc.*, 703 F.3d 497, 505 (10th Cir. 2012). Plaintiff can establish the third prong in various ways, including actions or remarks made by decisionmakers, preferential treatment given to employees outside the protected class, or the timing or sequence of events leading to the termination. *Id.*

The Court finds insufficient evidence to demonstrate the third prima facie element or, alternatively, to establish that Reed's stated reasons for termination were pretextual. Plaintiff helped Reed get elected, and Reed hired him for a key position on his staff. Less than a year later, Reed terminated him. The Court finds nothing linking the termination to any race-based animus harbored by Reed. Although Plaintiff's employees at the jail – specifically, Conley and Franklin – made racist remarks, there is no evidence linking any racially charged events or comments to Reed's termination decision. In fact, Conley was terminated within two days of making the racially charged comments about Plaintiff. Although there exist factual disputes as to why Conley was terminated,

the critical point is that Reed did not affirm, acquiesce in, or condone Conley's racial slurs toward Plaintiff in any manner.

The only racial remark directly attributable to Reed occurred when Reed drew a distinction between blacks and lesbians because blacks "can't help it" and are "born that way." Assuming this can be construed as reflecting racial bias, the remark was isolated and removed in time by six months from the time of Plaintiff's termination. Further, Reed made the decision to hire and fire Plaintiff. This makes it less likely that Reed's stated reasons for termination – namely, that Plaintiff failed to meet expectations and that he had lost trust and confidence in Plaintiff – were a pretext for race discrimination. *See Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1183 (10th Cir. 2006) (explaining that courts apply a "strong inference" that a defendant's proferred reason for termination is not pretextual where a minority plaintiff is hired and fired "in short order" by the same individual); *Johnson v. Okla. Dep't of Transp.*, 645 F. App'x 765, 767 (10th Cir. 2016) ("After all, it would make little sense for an employer to hire an employee with full awareness of his race only to fire him a short time later because of it.").

Plaintiff's overarching theory, divorced from any race-based comments or animus actually held by Reed, is that Reed set Plaintiff up for failure by entertaining complaints about him from Plaintiff's white subordinates. Plaintiff's view is that, because he was black, white employees were allowed to go directly to Reed and complain about Plaintiff. This led to the erosion of Reed's confidence in Plaintiff's abilities, which led to his termination. Even assuming this scenario is true, it still does not create an inference of race discrimination by Reed. Reed is permitted to ignore the chain of command and evaluate his jail administrator however he sees fit, so long as those decisions are not race-based. There is nothing in the record establishing that Reed treated former white jail

administrators differently or failed to similarly evaluate their performance. The record creates a factual question as to whether Plaintiff's race made it more difficult to successfully complete his job, but this is a different issue from whether Plaintiff suffered discriminatory treatment by his employer. Clearly, Plaintiff had white staff members who resented him and one who exhibited racist tendencies. However, for purpose of a Title VII wrongful termination claim, Reed was simply required to treat Plaintiff in a race-neutral manner in making his termination decision, and the Court finds nothing to suggest Reed fired Plaintiff for any race-based reasons.

### 2. Retaliation

Plaintiff also claims his termination was retaliation for engaging in protected opposition to discrimination. Title VII forbids retaliation against an employee because he has opposed any practice made unlawful by Title VII or because he has participated in an investigation, proceeding, or hearing regarding a claim of discrimination. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1219 (10th Cir. 2013). The *McDonnell Douglas* framework also applies to retaliation claims. *Id.* A prima facie case of retaliation requires a plaintiff to show: (1) that he engaged in protected opposition to discrimination; (2) that a reasonable employee would have found the challenged action materially adverse; and (3) that a causal connection existed between the protected activity and the materially adverse action. *Id.*

Plaintiff argues he engaged in protected opposition to discrimination by reporting Conley's racially hostile behavior to Reed. Specifically, Plaintiff told Reed that Plaintiff "had been called a nigger and everything" by Conley. (Pl.'s Dep. 92:8-9.) Even assuming this report qualifies as protected opposition to discrimination, which is questionable, Plaintiff cannot clear the third prima facie hurdle. There is no evidence linking this complaint on May 20, 2013 to his termination almost

six months later. In fact, according to Plaintiff, Reed directed Plaintiff to investigate the incident. Although there are factual disputes as to whether Conley was terminated for this precise incident or for other racial remarks, there is no dispute that Conley was terminated shortly after Plaintiff's report to Reed. Plaintiff cannot show causation because the alleged opposition was acted upon, the racial comments from Conley ceased, and Plaintiff was terminated several months after the report.

For the first time in his Supplemental Response to Defendant Reed's Motion for Summary Judgment, Plaintiff argues that Reed's "actions in procuring felony embezzlement charges were in direct retaliation for Jackson filing his discrimination lawsuit against Defendant Reed." (Doc. 67 at 8.) This is a new retaliation theory that does not appear in the pleadings or prior summary judgment briefing, and the Court will not permit insertion of this new theory via a supplemental response. *See Spencer v. Wal-Mart Stores, Inc.*, 203 F. App'x 193, 196 n.2 (10th Cir. 2006) (holding that raising a new theory of liability during summary judgment pleadings "does not properly present a claim to the district court for review, and accordingly the district court did not err in ignoring this claim in its order"): *Orr v City of Albuquerque*, 416 F.3d 1144, 1153 (10th Cir. 2005) (holding that district court did not abuse its discretion in refusing to consider theory of recovery raised for first time in summary judgment pleadings).[2]

### 3. Disparate Treatment (other than Termination)

There is no evidence that, apart from his termination, Plaintiff suffered any adverse employment actions during his time as jail administrator. Plaintiff never received any demotions, pay cuts, reassignments, or other significant changes in responsibility. Further, Plaintiff has failed

---

[2] Defendants also argue this new theory would be subject to dismissal based on Plaintiff's failure to exhaust administrative remedies and lack of evidence of causation. The Court does not reach these questions.

to offer evidence that any white employees to whom he was similarly situated received better treatment. While Plaintiff appears to believe he was scrutinized more closely than past jail administrators, Plaintiff has failed to offer any evidence of this disparate treatment other than Plaintiff's own conclusory statements.

### 4.     Hostile Work Environment

"Although Title VII does not explicitly mention hostile work environment, a victim of a racially hostile work environment may nevertheless bring a cause of action under Title VII." *Ford v. West*, 222 F.3d 767, 775 (10th Cir. 2000). In order for such claim to be actionable, a plaintiff's workplace must be permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1144 (10th Cir. 2008). Pervasiveness and severity are independent and equal grounds upon which a plaintiff may establish this element of a hostile environment claim. *Id.* A sufficiently severe episode may occur as rarely as once, "while a relentless pattern of lesser harassment that extends over a long period of time also violates the statute." *Id.* A court must consider the work atmosphere both objectively and subjectively, looking at all the circumstances from the perspective of a reasonable person in the plaintiff's position. *Id.* This includes consideration of the "conduct's frequency and severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the plaintiff employee's work performance." *Id.*

Conley's comments, while clearly reflecting racial animus, occurred on an isolated occasion out of Plaintiff's presence and did not alter Plaintiff's employment or create an "abusive" environment. Conley's comments were, at best, evidence of a subordinate employee harboring

racial animus toward his supervisor. Any such animus ceased to affect Plaintiff upon Conley's almost immediate termination. The only other jail employee accused of racist remarks is Franklin. Franklin made "some smart-like remarks" and "little nigger jokes," but he did not direct the jokes to Plaintiff. There is no record evidence as to how often these occurred or how they affected Plaintiff's work.

No reasonable jury could conclude Plaintiff's workplace was permeated with discriminatory intimidation, ridicule, or insult that was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. Plaintiff's hostile work environment theory is weakened by the fact that the harassers were subordinate employees. While this type of harasser/harasee relationship does not preclude liability, the relationship makes it less likely that the harassment, viewed objectively, altered the terms of employment and/or resulted in an abusive environment. The Court finds that any racial harassment by Plaintiff's subordinates did not unreasonably interfere with Plaintiff's work performance.

With respect to whether Reed, Plaintiff's supervisor, created or failed to remedy a racially hostile work environment, this theory also fails. Reed's "born that way" comment regarding blacks was made calmly and during a colleague-to-colleague discussion with Plaintiff about Plaintiff's decision to hire a lesbian. While Plaintiff understandably interpreted Reed's comment in a pejorative manner, the isolated comment is not objectively "severe" and certainly did not create a racially hostile work environment. Nor does the Court find adequate evidence that Reed intentionally acquiesced in, encouraged, or failed to remedy any racial harassment by Plaintiff's subordinate employees. Although Plaintiff focuses on a factual dispute as to why Conley was

terminated, there is no dispute that Conley was terminated shortly after his racist remarks about Plaintiff.

Because no reasonable jury could conclude that a Title VII violation occurred in conjunction with any aspect of Plaintiff's employment or termination, Reed is entitled to summary judgment on Plaintiffs' third, fourth, and seventh claims for relief.

### B. § 1983 Claims

#### 1. Unequal Pay

In his fifth claim for relief against Reed and BOCC, Plaintiff asserts that Reed violated 42 U.S.C. § 1981 by paying him less than similarly situated white employees and seeks redress for such violation under 42 U.S.C. § 1983. (Am. Compl. ¶ 50.) Plaintiff has not presented any evidence of unequal pay and does not mention this theory of discrimination in his response brief. Accordingly, Reed is entitled to summary judgment on the fifth claim for relief.

#### 2. Race Discrimination

In his sixth claim for relief against Reed and BOCC, Plaintiff alleges that there is an "affirmative link" between the race discrimination Plaintiff suffered and the "policies, practices and/or customs" promulgated by Reed. (*Id.* ¶ 52.) Plaintiff alleges that such policies include: "failure to ensure African-American employees were not treated in a discriminatory manner, failure to address and rectify instances on which the Defendants were made aware of discriminatory treatment, and the failure to abide by any grievance process whatsoever when employees allege discrimination." (*Id.* ¶ 53.) According to the Amended Complaint, this conduct violated the Due Process Clause of the Fourteenth Amendment. Therefore, Plaintiff asserts a § 1983 claim independent of Title VII and premised upon the Due Process Clause, although based on the same

facts relevant to his Title VII claims. *See Notari v. Denver Water Dep't*, 971 F.2d 585, 587 (10th Cir.1992) ("[T]he basis for a § 1983 claim is independent from Title VII when it rests on substantive rights provisions outside Title VII – that is, when it rests on a constitutional right or a federal statutory right other than those created by Title VII."); *Taite v. Ramos*, 618 F. App'x 392, 395 (10th Cir. 2015).

### a. Individual Capacity

Reed raised the defense of qualified immunity. Where qualified immunity is raised at the summary judgment stage, courts must grant qualified immunity unless a plaintiff can show "(1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014).

For the same reasons explained above with respect to Title VII, a reasonable jury could not find facts supporting a violation of Plaintiff's constitutional rights. As explained above, even construing the facts in Plaintiff's favor, a jury could not conclude that Reed terminated Plaintiff for discriminatory reasons, subjected him to a racially hostile work environment, or failed to remedy a racially hostile work environment. Nor is there evidence from a which a reasonable jury could conclude Reed "promulgated, created, implemented or possessed responsibility for the continued operation of a policy" that caused Plaintiff to suffer any constitutional harm. *See Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010). Accordingly, Reed is entitled to qualified immunity on Plaintiff's § 1983 claim asserted against him in his individual capacity.

### b. Official Capacity

Plaintiff's official capacity claim against Reed "is the same as bringing a suit against the county." *Martinez v. Beggs*, 563 F.2d 1082, 1091 (10th Cir. 2009). This claim fails based on the absence of any underlying violation of Plaintiff's constitutional rights. *Id.* ("A county or sheriff in his official capacity cannot be held "liable for constitutional violations when there was no underlying constitutional violation by any of its officers."). Accordingly, Reed is also entitled to judgment on Plaintiff's § 1983 claim asserted against him in his official capacity.

### C. Tortious Interference With Contract

In his first and second causes of action, Plaintiff asserts claims for "tortious interference with business relationship and contract" and "intentional interference with economic advantage against Reed." Under Oklahoma law, these claims are not distinct torts and require the same proof. *Tuffy's, Inc. v. City of Okla. City*, 212 P.3d 1158, 1165 (Okla. 2009) ("The terms malicious interference, intentional interference, and tortious interference with contract or business relations have been used interchangeably in Oklahoma jurisprudence, and do not designate distinct torts . . . ."). To establish this tort, Plaintiff must show: (1) the interference was with an existing contractual or business right; (2) such interference was malicious and wrongful; (3) the interference was neither justified, privileged, or excusable; and (4) the interference proximately caused damage. *Moore v. City of Tulsa*, 55 F. Supp. 3d 1337, 1348 (N.D. Okla. 2014) (applying Oklahoma law).

The evidence shows: (1) Plaintiff had been hired as an employee of Delaware County when Reed spoke with Moore; (2) Moore terminated Plaintiff after speaking with Reed; and (3) Moore suspended and ultimately terminated Plaintiff for reasons related to their conversation. This is sufficient to survive summary judgment on the first and fourth elements.

The second and third elements – namely, whether Reed's conversation with Moore was "malicious and wrongful" and not "justified, privileged, [or] excusable" – require further analysis. Malice, in this context, requires "'an unreasonable and wrongful act done intentionally, without just cause or excuse,' and it 'requires a showing of bad faith.'" *Hankins v. Welch State Bank*, No. 14-CV-0398-CVE-PJC, 2014 WL 5472753, at *5 (N.D. Okla. Oct. 28, 2014) (quoting *Tuffy's, Inc.*, 212 P.3d at 1165). Accepting Plaintiff's version of events, a jury could conclude that Reed acted unreasonably, intentionally, and with the bad-faith motive of getting Plaintiff fired from his new position in Delaware County. First, the discovery of the missing items and the conversation with Moore occurred so close in time as to raise an inference that Reed manufactured a reason to get Plaintiff fired from his new position. Construed in Plaintiff's favor, Goodman gave conflicting testimony in his deposition and in the preliminary hearing regarding his "discovery" of the missing items. Specifically, Goodman stated he "noticed several items were missing" in his deposition, indicating Goodman discovered items were missing and then told Reed, thereby instigating the entire process. Conversely, in the preliminary hearing, Goodman testified that he first learned the items were missing when Plaintiff called him and tried to return them. This contributes to the existence of a jury issue as to why and when the missing items were discovered.

Second, even if discovery of the missing items was coincidentally timed with Plaintiff being hired by Moore, Reed's reaction of immediately using the word "embezzlement" and contacting Moore could raise an inference of a bad-faith motive. Reed did not contact Plaintiff or seek return of the items before contacting Moore. Further, Reed told Moore that he would be initiating an OSBI investigation at a later time, indicating the OSBI had not begun any investigation at the time Reed spoke to Moore.

Finally, events occurring after the alleged interference could raise an inference of bad faith. This evidence includes: (1) Reed did not ask OSBI to drop the investigation (and perhaps first

17

initiated the investigation) *after* Plaintiff returned all items undamaged; (2) Reed encouraged prosecutors to file criminal charges almost two years after the alleged crime, and only after Plaintiff sued Reed for discrimination; and (3) Reed testified in the preliminary hearing that he never believed or had evidence Plaintiff used the missing items for his personal benefit. These later events are not conclusive as to Reed's motive at the time of the alleged interference, but they are certainly relevant and could support a finding of a bad-faith motive. Although Reed urges he is entitled to summary judgment because Moore legitimately and justifiably needed to know about the "embezzlement investigation," the Court finds questions of fact as to the precise sequence of events and finds a reasonable jury could conclude Reed acted with malice and bad faith when he spoke with Moore.

### IV.     BOCC's Motion for Summary Judgment

#### A.     Title VII

BOCC disputes whether it is a proper party to these claims under Oklahoma statutory law. Even assuming BOCC is a proper party to the Title VII claims, the Court's summary judgment analysis would extend equally to any claims properly asserted against BOCC. Therefore, BOCC is entitled to summary judgment on all Title VII claims.

#### B.     Tortious Interference

The Amended Complaint fails to name BOCC as a defendant to the first two causes of action. Nor does the Amended Complaint otherwise indicate that Plaintiff seeks to hold BOCC liable in tort. In contrast, in the final four claims, the Amended Complaint states in the heading "Against the BOCC" or "Against all Defendants," making it clear that BOCC is a defendant to such claims. BOCC is entitled to summary judgment because it is not a properly named defendant to the tort claims.

Even assuming it is a proper defendant, BOCC would be entitled to summary judgment because it may not be held liable for torts committed by county employees outside the scope of their

employment under the Oklahoma Government Tort Claims Act ("OGTCA"). Okla. Stat. tit. 51, § 153(A) ("[A] political subdivision shall not be liable under the provisions of this act for any act or omission of an employee acting outside the scope of employment."). Based on its requirement of malice and bad faith, the tort of intentional interference with contract is necessarily outside the "scope of employment" definition in the OGTCA. *See id.* § 152(12) (defining "scope of employment" to include "acting in good faith"); *Fehring v. State Ins. Fund*, 19 P.3d 276, 283 (Okla. 2001) (holding that when the tort sued upon requires proof of an element "that necessarily excludes good faith conduct on the part of governmental employees, there can be no liability against the governmental entity in a GTCA-based suit").

## V.     Conclusion

BOCC's Motion for Summary Judgment (Doc. 48) is GRANTED. Reed's Motion for Summary Judgment (Doc. 49) is GRANTED in part and DENIED in part as follows. The motion is granted as to all Title VII claims and all § 1983 claims, whether asserted against Reed in his individual or official capacity. The motion is denied as to the two tortious interference claims, which shall be treated as one claim for purposes of trial.

The stay (Doc. 51) is LIFTED. The parties are ordered to meet and confer and file a Notice of Proposed Schedule governing the remainder of the litigation no later than two weeks from the date of this Order.

**Dated this 10th day of March, 2017.**

**TERENCE KERN**
**United States District Judge**